IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PAUL ANTHONY DICKENS | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-23-177 |
| v. | * | |
| R. CONNER *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * *

**MEMORANDUM OPINION**

Self-represented Plaintiff Paul Anthony Dickens ("Ms. Dickens") is a transgender woman who uses she/her pronouns. Ms. Dickens filed this Section 1983 lawsuit against several employees of Maryland's Department of Safety and Correctional Services ("Defendants")[1], alleging that her First and Eighth Amendment rights were violated by prison employees. ECF 17. Defendants now seek sanctions in the form of dismissal with prejudice, alleging that Ms. Dickens has made repeated false allegations and submitted fraudulent documents in the course of this litigation. ECF 70-1. Ms. Dickens opposed, ECF 73, and Defendants filed a reply memorandum, ECF 77. There is no need for a hearing because the robust (and largely undisputed) record provides a sufficient basis to decide this Motion without any determinations about witness credibility. *See* Loc. R. 105.6 (D.

---

[1] Ms. Dickens also named several John Does in her Complaint, who are not represented by the Attorney General of Maryland. "Defendants" refers only to the named defendants represented by the Attorney General of Maryland. They are Ronald Conner, Lieutenant James J. Smith, Michael Yates, Y. Gary Sindy, Michael Nines, Joseph R. Jefcoat, Sergeant Corey Mackenzie, Ronald S. Weber, and Carolyn J. Scruggs.

Md. 2023). For the reasons described herein, Defendants' Motion for Sanctions will be GRANTED, and this case will be DISMISSED with prejudice against all of the named parties.

## I. BACKGROUND

The facts relevant to this motion largely stem from the winding procedural history of this matter.

Ms. Dickens is a transgender woman who is currently incarcerated at Jessup Correctional Institution ("JCI"). She alleges that she was sexually assaulted twice when she was incarcerated at another facility, Western Correctional Institution ("WCI") and then retaliated against when she reported the incidents. ECF 17 at 3. Ms. Dickens filed this lawsuit in January of 2023, seeking redress for those events, and soon thereafter sought a preliminary injunction. ECF 1, 4. This Court denied her motion for a preliminary injunction, but granted her leave to file an Amended Complaint. ECF 5. In response to that order, Ms. Dickens represented to the Court that she was "illiterate" and "cannot read or write" and requested court-appointed counsel. ECF 6. The Court appointed counsel under the understanding that Ms. Dickens could not read or write. ECF 7 (finding Ms. Dickens's circumstance "extraordinary" and deserving of limited pro-bono appointment resources). With the assistance of her appointed counsel, Ms. Dickens filed her Amended Complaint on September 7, 2023. ECF 17. Defendants moved for summary judgment, or to dismiss. ECF 34.

While that Motion was pending, Ms. Dickens filed an emergency motion for equitable relief on February 7, 2024, seeking an order from this Court to place her in protective custody and to restore phone privileges on her prison tablet, which had been revoked. ECF 39. Defendants opposed the motion. ECF 41. In the emergency motion, Ms. Dickens insisted her placement in administrative segregation was a punitive measure that both compromised her safety and limited

her access to prison resources, as compared to protective custody. ECF 39 ¶ 6. Ms. Dickens admitted to being (despite her own suggestions to the contrary) "presently safe in administrative segregation." ECF 39 ¶ 6. Defendants rejoined that Ms. Dickens had never requested protective custody nor any review of her placement in administrative segregation. ECF 41 at 4–5. Defendants, citing to the official policy for housing assignments, clarified that administrative segregation is not a punitive measure, but rather a protective measure for inmates who are subject to a "pending investigation into [a] possible threat to the[ir] safety and wellbeing." ECF 41 at 3. As to the tablet, Ms. Dickens stated only that she lost access to it and was accordingly having difficulty corresponding with court-appointed counsel. ECF 39 ¶ 11. Defendants clarified that Ms. Dickens's tablet had been seized as the instrumentality of a crime—namely, Ms. Dickens used her tablet to send messages in which she threatened to "start a riot" and to have two correctional officers killed. ECF 41 at 6. In fact, Ms. Dickens pleaded guilty to making a threat of mass violence based on those facts on June 27, 2024. ECF 70-10. Ms. Dickens, who was at that time represented by court-appointed counsel, did not submit any reply once these facts were revealed.

      This Court declined to intervene as to either request in the emergency motion, concluding that, "Questions regarding the appropriate type of incarceration or affording inmate privileges like tablet usage are for prison administrators, not for the courts." ECF 44.

      This lawsuit proceeded, and Ms. Dickens filed a response to Defendants' earlier motion for summary judgment or to dismiss. She submitted exhibits, including a signed declaration and several attachments. ECF 48, 48-2.[2] In their reply brief, Defendants alleged that Ms. Dickens's declaration contained several falsehoods, including her attestations that two of the letters she

---

[2] Then-counsel for Ms. Dickens substituted this signed version for a previously unsigned version with this Court's permission, citing delays in receiving mail from Ms. Dickens. ECF 48 at 4 n.2.

attached were "true and correct copies" of her communications from two wardens. ECF 60 at 2–5. The purported authors of those letters, who were wardens at two different facilities where Ms. Dickens had been housed over time, submitted declarations stating that they had not written the letters, and that their signatures on those letters had been forged. ECF 60-1 (Declaration of Ronald S. Weber); ECF 60-2 (Declaration of Robert S. Dean). Each declarant noted that the letter attributed to him contained numerous grammatical and stylistic errors that he would not have made, including misgendering Ms. Dickens. ECF 60-1; ECF 60-2. Warden Weber noted that the handwriting used for the letter that was supposedly from him and the handwriting used in Ms. Dickens's initial letter to him were identical. ECF 60-1 at 2; *see also* ECF 48-2 at 5. Warden Dean noted that "the typeface of the letter is consistent with the typeface of typewriters that incarcerated persons … are permitted to use." ECF 60-2 at 3; *see also* ECF 48-2 at 9. Upon receiving those declarations, then-counsel for Ms. Dickens swiftly requested to withdraw the two exhibits and any references to them in any prior filings, including the Amended Complaint. ECF 58.

On June 7, 2024, this Court ordered Ms. Dickens to show cause as to why her filing of falsified exhibits did not violate Rule 11. ECF 61. Ms. Dickens replied via a letter, which states it was typed by another inmate named Danny Haskins. ECF 62. Ms. Dickens signed the letter herself. *Id.* Although the filing is not a model of clarity, it essentially accuses some unknown person of submitting the fraudulent warden letters to Ms. Dickens's then-attorney without her knowledge. *Id.*

The Court also rescinded its prior order appointing pro bono counsel, ECF 8, finding that "[t]his situation place[d] court-appointed counsel in a difficult ethical bind" which made it "no longer appropriate to require their involvement in this matter." ECF 61 at 2. The Court denied Defendants' pending motion to dismiss the Amended Complaint without prejudice, citing the

procedural morass surrounding it, and stated that it would attempt to locate and appoint new pro bono counsel willing to enter an appearance on behalf of Ms. Dickens. ECF 63 at 3. Despite its initial efforts, the Court was unable to identify willing pro bono counsel, given what had transpired with prior counsel.

Defendants separately filed a renewed motion for summary judgment and to dismiss, ECF 71, which the Court has ordered held in abeyance pending the resolution of this Motion. ECF 75. Also, on August 14, 2024, Defendants filed the instant motion asking this Court to impose sanctions on Ms. Dickens by dismissing this suit with prejudice.

## II.   LEGAL STANDARDS

Defendants seek sanctions under this Court's inherent authority and Federal Rule of Civil Procedure 11.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (internal quotation marks and citations omitted); *see also Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (explaining that district courts "have the inherent power to order sanctions to preserve the integrity of the judicial process and to punish bad-faith conduct intended to delay or disrupt the course of litigation or to impede enforcement of a court order" (internal quotation marks and citation omitted)).

The Supreme Court has noted that the inherent power to sanction "must be exercised with restraint and discretion," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). Accordingly, "[s]anctions may be awarded only in the face of misconduct of some sort." *Fidrych v. Marriott*

5

*Int'l, Inc.*, 952 F.3d 124, 146 (4th Cir. 2020). Sanctions pursuant to a court's inherent authority are appropriate where filings "involve fraud, deceit, misrepresentation, harassment and unethical conduct." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 281 (4th Cir. 2022). "Under the inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). "[T]he inherent power to dismiss a case for … misconduct …is undoubtedly clear." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993); *see also in re Jemsek Clinic, P.A.*, 850 F.3d 150, 158 (4th Cir. 2017) ("Federal courts have the inherent power to dismiss an action with prejudice as a sanction.").

Defendants also ask this Court to impose sanctions pursuant to Fed. R. Civ. P. 11. Rule 11 requires an individual who "presents" any document to a court "whether by signing, filing, submitting, or later advocating it" to certify, *inter alia*, that "it is not being presented for any improper purpose," and "the factual allegations have evidentiary support." Fed. R. Civ. P. 11(b); *see also in re Bees*, 562 F.3d 284, 287 (4th Cir. 2009). If a court determines that Rule 11 has been violated, "after notice and a reasonable opportunity to respond," it may impose "an appropriate sanction on any … party that violated the rule *or is responsible for* the violation." Fed. R. Civ. P. 11(c)(1) (emphasis added). Rule 11 requires a finding of objective bad faith. *Artco Corp. v. Lynnhaven Dry Storage Marina, Inc.*, 898 F.2d 953, 956 (4th Cir. 1990).

Under either basis, Defendants seek the ultimate sanction of dismissal. The Fourth Circuit has explained that courts "should impose the least severe sanction to serve the purposes of Rule 11." *In re Kunstler*, 914 F.2d 505, 522 (4th Cir. 1990). But "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the administration of justice or

6

undermines the integrity of the process, the court has an inherent power to dismiss." *Shaffer Equip.*, 11 F.3d at 462.

The Fourth Circuit has provided six factors for district courts to consider in evaluating dismissal as a possible sanction:

> (1) The degree of the wrongdoer's culpability;
> (2) The extent of the client's blameworthiness if the wrongful conduct is committed by is attorney, recognizing that we seldom dismiss claims against blameless clients;
> (3) The prejudice to the judicial process and the administration of justice;
> (4) The prejudice to the victim;
> (5) The availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and
> (6) The public interest.

*Shaffer Equip.*, 11 F.3d at 462–63; *see also Rangarajan v. Johns Hopkins University*, 917 F.3d 218 (4th Cir. 2019).

This motion also implicates the Court's discretionary power to appoint pro bono counsel in civil cases. 28 U.S.C. § 1915(e)(1) authorizes courts to "request an attorney to represent any person unable to afford counsel." Court-appointed counsel "is a privilege and not a right." *Bowman v. White*, 388 F.2d 756, 761 (4th Cir. 1968). The Fourth Circuit has clarified that the use of limited pro-bono counsel resources is only for "exceptional circumstances." *Miller v. Simmons*, 814 F.2d 962, 965 (4th Cir. 1987). In other words, "[i]f it is apparent to the district court that a pro se litigant has a colorable claim but lacks the capacity to present it, the district court should appoint counsel to assist him." *Whisenany v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *rev'd on other grounds by Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989). But Section 1915 "does not authorize the federal courts to make coercive appointments of counsel." *Mallard*, 490 U.S. at 310.

Because Plaintiff is self-represented, her pleadings are "liberally construed" and "held to less stringent standards than [those filed] by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (noting that writings by self-represented complainants are held to "less stringent standards than formal pleadings drafted by lawyers"). However, Rule 11, by its terms, applies equally to attorneys, self-represented parties, and even represented parties. Fed. R. Civ. P. 11(c)(1). And the Court's inherent authority to impose sanctions applies equally to all litigants. *Shaffer Equip.*, 11 F.3d at 462.

### III. DISCUSSION

This Court will first assess Defendants' allegations of Plaintiff's misconduct, and whether sanctions under Rule 11 or this Court's inherent authority are appropriate. Finding that sanctions are appropriate under either framework, the Court will then assess whether dismissal is warranted.

1. Alleged Sanctionable Conduct

Defendants argue that Plaintiff has engaged in three distinct buckets of deceptive acts that ultimately form a pattern of conduct. Defendant must prove that the misconduct occurred by clear and convincing evidence. *See Barber v. Coastal; Horizons Ctr.*, 21-cv-00061, 2023 WL 2302003, at *2 (E.D.N.C. Mar. 1, 2023); *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). The Court will address each bucket in turn.

   a. *Misrepresentations Regarding Literacy*

At the outset of this case, Ms. Dickens represented to this Court that "I am illiterate I cannot read or write," and that "I want to meet the courts [sic] requirements but without help or someone from the court or A Lawyer I will not." ECF 6. That assertion led to this Court's

8

determination that her case presented an "exceptional circumstance" deserving of the Court's limited capacity to appoint pro bono counsel in civil matters. ECF 7.

Defendants now provide several pieces of evidence showing Ms. Dickens's assertion was false. First, Ms. Dickens's educational needs assessment—which was not conducted for purposes of this litigation—placed her at a second-to-eighth grade reading level, which is "where the majority of incarcerated persons who are tested fall." ECF 70-4, 70-5. An educational specialist interpreting the results clarified that "Dickens can read and write" and is not illiterate. *Id.* Next, Defendants note that Ms. Dickens has submitted to this Court several administrative remedy procedure forms ("ARP"), none of which contain any indication they were written by someone other than Ms. Dickens. *See* ECF 70-9.[3] Although it is possible in theory that Ms. Dickens had assistance from other inmates in handwriting her ARPs, a few factors suggest that she did not. First, Ms. Dickens submitted ARPs filed while incarcerated at two different correctional facilities, and yet the handwriting on the forms appears identical.[4] It would be unusual to befriend individuals with seemingly identical handwriting at two separate institutions. Next, the letter Ms. Dickens attributed to Warden Weber also appears to be in the same handwriting as the ARPs (both portions

---

[3] In this litigation, Ms. Dickens has generally, and appropriately, indicated where others have handwritten or typed documents on her behalf.

[4] This Court does not profess to be a handwriting expert, and the findings herein do not rest on any conclusions about the similarity of handwriting. The obvious similarities merely constitute a piece of evidence supporting the ultimate conclusion that Ms. Dickens is capable of writing.

of the form, the portion purporting to be from Ms. Dickens to the warden and the warden's purported response). ECF 48-2 at 5.[5]

In her briefing, Ms. Dickens clarified that she attended special education classes until the ninth grade, and had educational challenges throughout her schooling. ECF 73 at 1. She also disputed that her test results indicated that she is able to read and write because she scored a 50% or less on each part. *Id.* She conceded that she physically wrote the ARPs, "but only after receiving written and oral instructions" as well as a laundry list of written materials from persons providing assistance. *Id.* at 2. In an accompanying declaration, another incarcerated person who has assisted Ms. Dickens with her filings clarified that he did not write any of the ARPs, but sent Ms. Dickens several written notes with "extensive information" that she incorporated into her ARPs. ECF 73-1 ¶ 8.

All in all, while Ms. Dickens disputes the degree of her literacy, her own admissions make it quite obvious that, at a minimum, her initial statement that she was could not read or write was untrue. Ms. Dickens signed and submitted numerous documents to this Court—some of which she now admits she personally wrote—representing that she was unable to read or write. *See, e.g.*, ECF 70-9 at 10, 19, 30, 45, 59, 70. The ARPs that Ms. Dickens now admits she wrote demonstrate her ability to successfully advocate for herself in writing with assistance from other incarcerated persons. The Court finds that this misconduct occurred by clear and convincing evidence. Ms. Dickens's misrepresentations to this Court about her literacy status clearly violate Rule 11(b), and

---

[5] In addition, most ARPs refer to "self" in the CC line. *See*, *e.g.*, ECF 70-9 at 10, 19, 30, 45. It would be strange for someone other than Ms. Dickens to have written that notation. The handwriting also matches statements that Ms. Dickens wrote with a witness present, that similarly bear no indication of a different author. ECF 70-9 at 59, 70. Ms. Dickens has also signed numerous documents in this case, consistently using the same neat cursive signature.

undermine the orderly administration of justice in this Court—in particular, because this deception led the Court to expend very limited pro bono counsel resources on this case.[6]

      b. *Misrepresentations Underlying Ms. Dickens's Emergency Motion for Equitable Relief*

Defendants next argue that each part of Ms. Dickens's Emergency Motion for Equitable Relief and Request for Expedited Ruling, ECF 39, relied on significant omissions. In her motion, which this Court denied, *see* ECF 44, through her court-appointed counsel, Ms. Dickens sought an emergency order from this Court to transfer her to protective custody and to restore her tablet privileges. ECF 39. Ms. Dickens alleged that her tablet was her only effective means of communicating with counsel. ECF 39 ¶ 11.

Defendants replied there, ECF 41, and repeat here, ECF 70-1, that Ms. Dickens omitted critical details from that motion—namely, that Ms. Dickens had never requested transfer to protective custody,[7] and that her tablet was confiscated because she used it in the commission of a crime. Ms. Dickens did not respond to these allegations in her responsive pleading at this stage, ECF 73, and when confronted with these facts at the emergency motion stage, appointed counsel did not file a reply. There is no room for dispute about the tablet: Ms. Dickens has pleaded guilty

---

[6] This Court's conclusion on the present record that Ms. Dickens can read and write alters its view of whether "extraordinary circumstances" exist warranting appointment of counsel. Even had this case continued, this Court would decline to ask new counsel to accept this pro bono appointment at substantial risk to their compliance with ethical requirements.

[7] Defendants have cited a declaration by an assistant warden at Ms. Dickens's current facility stating that (1) the facility does not have a protective custody housing unit; (2) Ms. Dickens had not requested protective custody or expressed concerns about her safety; and (3) Ms. Dickens had been placed in administrative segregation because of the pending investigation of her assault. ECF 41-2. Ms. Dickens also submitted a declaration in which she stated that she requested placement in protective custody on January 20, 2024, and later submitted another administrative request for transfer. ECF 39-4 ¶ 7-8. Ms. Dickens did not file any other evidence of either request. Because this dispute is one of witness credibility, and Defendants thus have not met their burden on the present record, the Court will focus on the undisputed evidence surrounding the tablet.

to making threats of violence using the tablet. ECF 70-10. Her omission of that fact (she stated only that she "lost access" to her tablet, *see* ECF 29-4 ¶ 9) is obviously an important one. Defendants also noted that Ms. Dickens's contention that she had no reliable means of communicating with her lawyer without her tablet was demonstrably false—her correctional facility maintained normal phones, including for legal calls, and allowed visitors. ECF 41 at 5–6; ECF 41-2 ¶ 10. And the challenges of scheduling privileged phone calls do not render them nonexistent. Ms. Dickens's court-appointed lawyer also prepared and filed the emergency motion, which included a declaration from Ms. Dickens. ECF 39-3 at 2. It is obvious they were in contact.

At a minimum, Ms. Dickens was less than candid with the Court in filing her emergency motion. Defendants have met their burden to show that Ms. Dickens made an intentional material omission regarding the circumstances surrounding the confiscation of her tablet.

    c.  *Submission of Forged Letters*

Defendants' final and most serious allegation of misconduct is that Ms. Dickens, through her then-counsel, submitted two forged letters to this Court as exhibits to her reply to Defendants' first motion to dismiss and falsely attested to the letters' accuracy in a signed declaration. No one disputes that the letters are fake. Even on a cursory glance, it is obvious that these letters were not authored by the individuals who supposedly signed them. One is written in the same handwriting as the ARP on the same page,[8] and the other appears to have been written on an inmate typewriter. The letters contained awkward syntax and grammatical errors that a professional staff member would be unlikely to make. Moreover, the purported authors of the letters disavowed them in

---

[8] Ms. Dickens has admitted she handwrote the ARP.

signed declarations under penalty of perjury. ECF 60-1; ECF 60-2. Ms. Dickens conceded that they are indeed fraudulent in her response to this Court's order to show cause. ECF 62.

This issue this Court is left to resolve is whether Ms. Dickens can be held responsible for the letters' submission. She places the blame on unknown other inmates, who she claims sent the falsified letters to her then-attorney without her knowledge. ECF 62. That explanation defies logic, common sense, and the evidentiary record. There is ample evidence that Ms. Dickens submitted the two letters to her counsel, and represented to her counsel that they were authentic. First, Plaintiff's former counsel noted in her brief that she had reviewed Ms. Dickens's declaration with her (which described and attached the letters) and that they had discussed its contents. *See* ECF 48 at 4 n.2 ("The facts stated in her declaration are based on a detailed call between counsel and Ms. Dickens in which Ms. Dickens confirmed the veracity of the statements in her declaration."). Due to issues with mailing, then-counsel had to later substitute the version of the declaration that Ms. Dickens had signed. Counsel clearly attested to the Court that Ms. Dickens had reviewed and understood the contents of her declaration—which, again, heavily focused on the contents of the letters. *Id.* Second, Ms. Dickens does not dispute that she signed the declaration, and she has never alleged that she did not understand what she was signing. At a minimum, it is clear that Ms. Dickens had the contents of the letters explained to her and knew that they were being submitted. Her present suggestion that she had nothing to do with them is patently untrue.

It also seems particularly unlikely, moreover, that the letters were randomly sent to Ms. Dickens's former counsel by some unknown inmate at all. For one, the Amended Complaint makes several references to the letters, and that pleading was filed well before the letters were actually submitted to the Court. It would be bizarre and ethically questionable for an attorney to incorporate letters received from a random third-party into a complaint without ever discussing them with her

client. Ms. Dickens has produced no statement from her former attorney suggesting that the letters were received in any irregular manner. In fact, Ms. Dickens has not mustered any evidence at all to support her outlandish allegation of a mystery sender. The Court need not credit totally unsupported factual allegations. *See Stone v. Maryland Medical Sys. Corp.*, 855 F.2d 167, 175 (4th Cir. 1988); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986).

Submitting falsified documents, making untrue statements in a declaration, and then making further false statements as a cover up, is a textbook violation of Rule 11(b). The Court finds, on the written record and uncontroverted evidence, that Defendants have demonstrated by clear and convincing evidence that Ms. Dickens engaged in this misconduct.

    d.  *Course of Conduct in Totality*

The events described above paint a troubling picture. At every stage of this litigation, Ms. Dickens has been dishonest, often making statements that are easily disproven.

Ms. Dickens's repeated dishonesty has been costly and time consuming. The Court expended limited pro-bono counsel resources based on representations about literacy that have now been disproven. Defendants have had to withdraw their initial Motion for Summary Judgment because Plaintiff's former counsel was forced to withdraw a significant portion of her response to avoid further perpetuating fraud on this Court. This Court has adjudicated an emergency motion based on questionable underpinnings and a material omission. At every juncture, Ms. Dickens has doubled-down and expounded upon her misrepresentations.

Sanctions are warranted and necessary here. Ms. Dickens has "abuse[d] the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (internal quotation marks and citations omitted). This is exactly the kind of case that implicates the Court's inherent power to impose sanctions "to preserve the integrity of the judicial process." *Life Techs. Corp. v.*

*Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019). The Court has allowed Ms. Dickens to respond, and she has only furthered her deceptive conduct. Even a non-attorney, and a person of limited literacy, is surely aware that it is unacceptable to sign and submit falsified documents. *See Artco Corp. v. Lynnhaven Dry Storage Marina, Inc.*, 898 F.2d 953, 956 (4th Cir. 1990). By submitting such documents, Ms. Dickens violated Rule 11. Moreover, Ms. Dickens has been given opportunities to course-correct and has not done so. Sanctions, under both Rule 11 and this Court's inherent authority, are necessary to deter future misconduct from Ms. Dickens.

    2.    <u>Appropriate Sanction</u>

The core question here is whether, through the pattern of conduct described above, Ms. Dickens has "deceive[d] court or abuse[d] the process at a level that is utterly inconsistent with the administration of justice." *Shaffer Equip.*, 11 F.3d at 462. The answer is unsurprising. Presenting false evidence alone is grounds for dismissal. *Id.* at 462 & n.6. Each of the six *Shaffer* factors, moreover, also supports dismissal.

    a.    *Blameworthiness and Involvement of Counsel*

The first two *Shaffer* factors can be addressed together. Ms. Dickens is the only one to blame for this predicament. There is no evidence that any other person submitted false evidence or made false statements to this Court. Indeed, Ms. Dickens has engaged in similar courses of dishonest conduct with and without a lawyer. Moreover, Ms. Dickens caused her pro bono attorney to unknowingly submit a false declaration and two falsified exhibits to this Court, which resulted in that counsel promptly withdrawing those exhibits and withdrawing substantial portions of other filings, and this Court relieving her of her appointment. Ms. Dickens has repeatedly signed and attested to statements that were demonstrably untrue. Because Ms. Dickens bears sole

responsibility for the sanctionable conduct at issue and her attorney bore no blame, this factor counsels in favor of dismissal.

### b. Prejudice to the Judicial Process and the Administration of Justice

Ms. Dickens's dishonesty has permeated through every aspect of this lawsuit, and has substantially impeded the judicial process and this Court's ability to administer this case. At this point, the issues surrounding Ms. Dickens's misrepresentations have overwhelmed the issues presented in her actual lawsuit. This Court has had to deny a motion without prejudice because it was essentially impossible to decide it given the false evidence and false statements infecting Ms. Dickens's responsive brief. The Court has appointed an attorney, allowed that attorney to withdraw to avoid an ethical dilemma, and sought to identify other willing pro-bono counsel (to no avail). This Court has also expended limited judicial resources to adjudicate an emergency motion premised on a less-than-candid representation of the relevant facts.

This Court has devoted substantial time to sorting through all of the falsehoods in Ms. Dickens's submissions. The smooth functioning of the judicial process depends fundamentally on the candor and good faith of all persons involved in it. The breakdown of that candor in this case has greatly prejudiced the administration of justice and supports dismissal with prejudice.

### c. Prejudice to the Victim

Ms. Dickens's conduct has generated substantial motions practice regarding her dishonesty, not the merits of this case. Defendants have no doubt expended significant resources responding to arguments mired in falsehoods. Moreover, Defendants have now had to file their motion for summary judgment or to dismiss twice, because the first response brief was so riddled with untruths and withdrawn evidence it became impossible to assess. Defendants have wasted

time and resources that would have been unnecessary had Ms. Dickens been honest and forthcoming in this litigation. This factor also favors dismissal.

> d. *The Availability of Other Sanctions*

No sanction short of dismissal could adequately punish and deter Ms. Dickens, who is indigent and would be unable to pay any sort of financial penalty. *See* ECF 2, 4. As Defendants have noted, a financial penalty would be inadequate to address this misconduct regardless. Merely striking filings would serve neither to deter Ms. Dickens nor to adequately reflect the seriousness of her misconduct. Several of Ms. Dickens's filings have already been withdrawn by her former attorney because they relied on dishonest statements or falsified exhibits. Even a show cause order did not deter Ms. Dickens from proffering a provably false narrative.

Ms. Dickens is clearly incapable of complying with her obligations under Rule 11(b) as an unrepresented party, and while represented she caused her counsel to unknowingly submit falsified documents. There is simply no way to ensure that Ms. Dickens (whether represented or not) will comply with Rule 11 in future filings. Here, "the least severe sanction to serve the purposes of Rule 11," is dismissal. *In re Kunstler*, 914 F.2d at 522. This Court has considered alternative sanctions, and ultimately finds that none would deter Ms. Dickens and adequately reflect the seriousness of her misconduct.

> e. *The Public Interest*

The public interest in the integrity of the judicial process is paramount. The public must be able to rely on fair judicial proceedings, and tolerating such repetitive dishonest conduct would undermine that trust. This process does not work without honesty. Beyond Ms. Dickens herself, imposing severe sanctions here serves to deter the general public from engaging in similar misconduct. *See also Nat'l Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)

("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."). Ms. Dickens's abuse of the judicial process is entirely incompatible with the fair administration of justice the public relies upon. "The courts must protect the integrity of the judicial process because, as soon as the process falters, the people are then justified in abandoning support for the system." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2011) (citations and internal quotation marks omitted).

In addition, this Court relies upon the goodwill of its bar to accept pro bono appointments and represent low-income, uncounseled persons with potentially meritorious civil claims. That system cannot survive if lawyers willing to take on such representations find themselves in ethical quandaries perpetrated by dishonest clients. The public interest requires this Court to sanction such abuses severely in order to protect its ability to provide high-quality legal representation for worthy causes. In sum, the public interest factor also supports dismissal.

\*   \*   \*

The test laid out by the Fourth Circuit in *Shaffer* makes clear that dismissal is the only sufficient sanction here. "The courts' inherent powers exist to preserve the integrity of the judicial process and the resources needed to resolve disputes in an orderly and expeditious manner—two indispensable assets in any nation dedicated to the rule of law." *In re Jemsek*, 850 F.3d at 157. Although this Court is "[m]indful of the strong policy that cases be decided on the merits," because Ms. Dickens has "deceive[d]" this Court and "abuse[d] the process at a level that is utterly inconsistent with the administration of justice," and "undermines the integrity of the process," this Court must dismiss this lawsuit with prejudice. *Shaffer Equip.*, 11 F.3d at 462.

IV. **CONCLUSION**

For the reasons stated above, Defendants' Motion for Sanctions is GRANTED. The Complaint is dismissed with prejudice, and this case will be CLOSED. A separate Order follows.


Dated: September 10, 2024                       /s/
                                        Stephanie A. Gallagher
                                        United States District Judge